Filed 6/3/21  In re X.B. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re X.B. et al., Persons Coming Under the Juvenile Court Law. | |
| TUOLUMNE COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M.H.,<br><br>Defendant and Appellant. | F081412<br><br>(Tuolumne Super. Ct. Nos. JV8141 & JV8142)<br><br>**OPINION** |

-ooOoo-

APPEAL from orders of the Superior Court of Tuolumne County.  Kate Powell Segerstrom, Judge.

Mara L. Bernstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Sarah Carrillo, County Counsel, and Maria Sullivan, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Appellant M.H. ("Mother") contends the Tuolumne County Department of Social Services (the "Department") failed to assess relatives for placement of her son, X.B., as required by law. As a result, she says the dependency court's findings that X.B.'s placement in foster care was "appropriate" and that the Department used due diligence to contact the child's relatives are not supported by substantial evidence. She contends the dependency court abused its discretion by failing to follow the relative placement preference, and that the dispositional orders should be reversed. We find that Mother forfeited her claims by failing to raise them below. We affirm.

**FACTS**

*June 2013 Referral*

Jack A. was born to Mother and Nathan A. in June 2013. On October 4, 2013, the Department received a referral alleging general neglect of then three-month-old Jack. It was reported that Mother and Nathan bought and sold marijuana from the residence and smoked while caring for Jack. A social worker made an unannounced visit, wherein Nathan claimed he lived with Mother's mother but could not provide the address. Mother stated both she and Nathan were unemployed. Mother and Nathan denied the allegations in the referral. Mother tested presumptively negative for "all illicit substances."

*September 2018 Referral*

In September 2017, X.B. was born to Mother and Casey B. ("Father"). On September 25, 2018, the Department received a referral alleging emotional abuse by Father. According to the referral, Father bit Mother on the forearm, leaving a visible mark. He also held a kitchen knife in his hand while standing in the doorway of their bedroom and threatened to kill Mother. Father threw empty beer cans at Mother while

2.

she was on their bed with X.B.  Father threw other items, punched a hallway closet, ripped a door off its hinges and broke it in half.  Father also pointed a drill at Mother.  Father subsequently acted aggressively toward law enforcement and was arrested.

Father admitted he had consumed a 12-pack of beer and six shots of whiskey before the incident, that he became angry, that he tore doors off of the closets and threw empty beer cans at Mother.  However, Father denied biting or threatening to kill Mother.

Father was referred to a program called MeWu:Ya[1] for anger management and substance abuse counseling.

*April 2019 Referral*

The Department received another referral on April 9, 2019.[2]  According to the reporting party, Mother said Father was abusive towards her and had "attacked" her.  Jack witnessed the attack.  Mother stated she had left Father and that a restraining order was in place against Father.

*May 2019 Referral*

The Department received another referral on May 3, 2019.  It was reported that Father had been arrested for domestic violence because he had " 'smashed [Mother's] face in.' "  Mother and Father subsequently reconciled.  Father was again arrested and then placed on an involuntary psychiatric hold.

Father also told his own father that he spanks X.B. regularly[3].

---

[1] This organization/program is apparently associated with the Tuolumne Me-Wuk Indian Health Center, Inc.

[2] The detention report describing these incidents lists the date and then a description of the referral.  It appears the date refers to the date of the referral, rather than the date of the incident described in the referral.  However, this is not entirely clear.

[3] X.B. would have been a little over one and a half years old at this time.

Finally, it was also reported Mother and Father use "illicit substances and alcohol."[4]

*August 2019 Referral and Visit*

The Department received another referral on August 15, 2019. According to the referral, people were selling drugs at Mother's home, including an individual named Blaze G. The referral also stated that Mother was using methamphetamine and heroin.[5]

On August 22, social workers and law enforcement personnel found empty plastic bags with white residue, plastic caps to syringes, and marijuana paraphernalia in the home. Mother claimed the items belonged to Blaze.

Mother tested positive for methamphetamines. Mother agreed to have Jack and X.B. stay with her mother until she tested negative for illicit substances. Mother was referred to MeWu:Ya.

Mother was tested on several occasions between August 23 and October 10, 2019, and the results were negative for "illicit substances."

*December 2019 Referral*

On December 2, 2019, the Department received another referral. The report indicated that another individual was arrested at Mother's house on a weapons charge. The reporting party indicated that Mother's friends bring weapons into the home, including Blaze who was now being referred to as Mother's "boyfriend."

*January 2020 Referral*

On January 23, 2020, the Department received a referral stating that on the previous day, Mother had a party with the children present, and became very intoxicated

---

[4] At the jurisdictional hearing, the dependency court sustained a hearsay objection as to this statement.

[5] The referral also stated that X.B.'s nursery has been turned into a "drug den" and that Mother was "running a 'trap house.' " The court sustained a hearsay objection as to these statements.

4.

and was "possibly under the influence of methamphetamines." The next morning, a man "overdosed" on Mother's doorstep, requiring an ambulance to respond.

*Events of February 2020*

Social workers contacted Jack at his elementary school on February 13, 2020. Jack said that a few days prior, Blaze had " 'busted the door' " trying to break in and take Jack from Mother. Mother tried to keep Blaze from entering the home. That day, social workers attempted to contact Mother at her home, and observed the front door was cracked and broken.

On February 14, 2020, social workers contacted a Tina M. with MeWu:Ya. She explained that Mother had not been going to the MeWu:Ya program and that her referral was closed. That same day, social workers again contacted Jack. Jack said he was "very scared" because Blaze had come to his house the day prior after school. Jack hid under his bed. When asked what his Mother did, Jack said she "did Kung Fu moves."

On February 19, 2020, social workers visited Mother's home. Mother said she had told Blaze he " 'couldn't come back.' " Mother denied using illicit substances, saying she was "only" smoking marijuana. Mother tested presumptively negative for "illicit substances."

Mother signed a safety plan whereby Mother agreed not to allow Blaze or any unsafe person into the home; refrain from using drugs and submit to weekly drug testing; and will have the children stay with family if unsafe situations arise.

On February 25, 2020, social workers visited Mother's home. Mother said she would submit to drug testing, but then claimed she was unable to produce a urine sample. The social workers returned later in the day and conveyed that it was "worrisome" Mother could not produce a urine sample. Mother eventually provided social workers a "small sample," but it was not body temperature.

The next day, on February 26, 2020, social workers returned to Mother's home. Again, Mother provided a "small sample" that was not body temperature. Mother reiterated her claim that she was not using drugs. When social workers returned later in the day to conduct a retest, Mother's mother claimed Mother was not there.

On February 26, 2020, the Department received a report indicating that Father had stabbed his brother-in-law, Steven S., and had been arrested. Jack was apparently sleeping in the home where the stabbing occurred. When asked why they allowed Mother and the children to be around Father when there was a restraining order in place, Steven said he thought keeping Father from the children was making things worse.

Steven reported to social workers that after the prior domestic violence incident between Mother and Father, Mother " 'fell off dramatically.' " She began to use drugs, so Steven and his wife (Father's sister), would take care of the kids "when they can to help her out."

*Dependency Proceedings Initiated*

Social workers sought and obtained protective warrants for Jack and X.B. on February 28, 2020.[6] The same day, the Department filed a dependency petition concerning two-year-old X.B., alleging he was a child described by subdivision (b)(1) of section 300. The petition alleged many of the events from February 2020 events described above. The petition alleged that X.B. witnessed Father's stabbing of Steve.

X.B. was placed with a resource family in Tuolumne County.

*Detention Report*

The Department filed a detention report on March 4, 2020. The report stated that there "are relatives to consider for placement," and specifically identified Kelli B., the

---

[6] Jack was in the custody of his father, Nathan A., on that date and was not detained.

paternal aunt. The report also indicated, "A family finding referral was made on the child's behalf on March 3, 2020."

*Jurisdiction Report*

The Department filed a jurisdiction report on May 5, 2020. This report also stated that there "are relatives to consider for placement."

The report explained that, on March 17, 2020, social workers were in contact with Father's cousin, Cheyenne M., who resided in Wisconsin. Social workers explained to Cheyenne that placement with her in Wisconsin would present issues with visitation.

Also, on March 17, 2020, social workers spoke with Michele D., the maternal grandmother, who requested to be assessed for placement. The social worker e-mailed Michele a link to apply for placement.

Michele also indicated that her son, Michael H., wanted to apply for placement. However, Michele indicated that Michael lives with his wife's family "who have significant criminal history." Michele said she would e-mail Michael's contact information to the social worker, but she did not ultimately do so. The social worker again requested Michael's contact information from Michele on March 19, 2020.

The report also indicated that the Department "does not believe [Kelli B.] would be an appropriate placement option …." The Department was "concerned" about her ability to protect X.B., considering that she "repeatedly allowed [Father] to reside with her and her children despite knowing his struggles with substance abuse." Also, Father had stabbed Kelli's husband, and they did not call law enforcement.

The Department held a "Child and Family Team Meeting" over videoconference "to discuss placement of the children and case planning services." Social workers attended, along with Michele, Kelli, and others. Mother failed to attend the meeting.

*Jurisdictional Hearing*

The jurisdictional hearing was held on May 5, 2020. Mother called the social worker as a witness. The social worker testified regarding various referrals referenced in the Department's reports. The social worker did not testify concerning X.B.'s placement. At the conclusion of the hearing, the court found the allegations of the petition true.

On May 18, 2020, Cheyenne filed a form JV-285, "Relative Information." Cheyenne said that if reunification was not successful, she would request placement. Cheyenne said she "know[s] that we would not be utilized as a placement option until thorough attempts at reunification … have been made." "If neither parent is able to achieve the goals for reunification myself and my husband … would like to be considered for placement and would be a long-term care option for the child to ensure [X.B] stays with our family."

Michele also filed a form JV-285, "Relative Information." Michele indicated she would like to have X.B. live with her. Michele also listed two aunt/uncle couples and another aunt as "relatives who might be able to help the child."

Michael also filed a form JV-285, "Relative Information." Michael offered to help X.B. in various ways, including talking on the phone and transporting him to medical appointments. However, Michael left blank the box next to "have the child live with me." Michael said he wanted to help Mother if he can. Michael's form said X.B.'s "grandma would love to adopt him."[7]

*De Facto Parent Request*

In June 2020, X.B.'s foster parents asked to be appointed his de facto parents.[8]

---

[7] Presumably, "grandma" refers to Michele.

[8] The court granted the request on July 28, 2020.

*Disposition*

On July 1, 2020, the Department filed a disposition report. In the report, the Department asserted that the dependency drug court program would provide Mother with the support and accountability to maintain long-term sobriety.

The relative placement section of the report largely repeated the information from the jurisdictional report.

The concurrent planning section of the report indicated that X.B.'s foster parents were supportive of his reunification with Mother "and is a concurrent home … if needed." The concurrent planning section did not mention any plans regarding X.B.'s relatives.

The disposition hearing for X.B. was held on July 1, 2020.[9] Near the outset of the hearing, Mother's counsel stated: "[T]o be clear, we are only contesting the DDC" (dependency drug court). Neither Mother nor any other party raised any issues concerning X.B.'s placement, nor relatives' requests for placement.

In its dispositional order, the court found X.B. to be a person described by section 300, subdivision (b) and ordered his continued removal from Mother and Father. The court found that the Department "has exercised due diligence to identify, locate, and contact the child's relatives." The court delegated custody of X.B. to the Department for placement in: (1) the approved home of a relative; (2) the approved home of a nonrelative extended family member; (3) a foster family home; or (4) a suitable licensed community care facility. The court also found X.B.'s current placement to be appropriate.

On July 10, 2020, Mother filed a notice of appeal as to X.B. and Jack's cases.[10]

---

[9] The disposition hearing for Jack also occurred that day. However, Mother only raises appellate issues concerning X.B.

[10] In her appellate briefing, however, Mother only raises issues as to X.B.

9.

## DISCUSSION

### I. Mother Forfeited Her Appellate Claims of Error by Failing to Raise Them Below

Mother contends the Department failed to assess relatives for placement of X.B. as required by law. As a result, she says the court's order finding X.B.'s placement "appropriate" and finding that the Department used due diligence to contact the child's relatives lacked substantial supporting evidence. She contends the dependency court abused its discretion by failing to follow the relative placement preference. We find that Mother forfeited these claims by failing to raise them below.

"[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court. [Citation.] The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. [Citation.] [¶] Dependency matters are not exempt from this rule. [Citations.]" (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. omitted.)

Mother did not raise the issue of relative placement at any time during the dispositional hearing (or in any filings pertaining to the dispositional hearing). If she had, perhaps the Department could have offered additional information concerning assessment of relatives. In any event, it was incumbent on Mother to raise the issue so the dependency court could consider it. She failed to do so.

Mother tries to frame her claim of error with respect to the relative placement preference as a "substantial evidence" challenge, immune from the rule of forfeiture. (See *In re R.V.* (2012) 208 Cal.App.4th 837, 848; *In re Javier G.* (2006) 137 Cal.App.4th 453, 464.) However, courts have specifically held that relative placement preference objections are subject to the forfeiture rule. (See *In re Cody R.* (2018) 30 Cal.App.5th 381, 391; *In re A.K.* (2017) 12 Cal.App.5th 492, 501.) Specifically, courts have held that a parent forfeits their claim "by failing to raise [a] relative placement preference objection" in the dependency court. (*In re A.K.*, at p. 501.) "In not bringing the

10.

placement issue to the juvenile court's attention at any time during [the] dependency proceedings, [Mother] has forfeited the issue on appeal. [Citation.]" (*In re Cody R.*, at p. 391.) We agree with these authorities and find the issue forfeited.[11]

## DISPOSITION

The dispositional orders are affirmed.

POOCHIGIAN, J.

WE CONCUR:

LEVY, Acting P.J.

SNAUFFER, J.

---

[11] We decline to excuse the failure to raise this issue below. Such action may be taken "rarely and only in cases presenting an important legal issue. [Citations.]" (*In re S.B.*, *supra*, 32 Cal.4th at p. 1293.) While the relative placement preference is generally important, this case does not present such an important *legal* issue as to excuse the failure to bring the alleged error to the attention of the trial court.